**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-1526
_____


CATHERINE WILLIS,
                              Appellant

v.

UPMC CHILDREN'S HOSPITAL OF PITTSBURGH

_____


On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 2-13-cv-00131)
District Judge:  Honorable Joy Flowers Conti
_____


Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
December 7, 2015

Before:   FUENTES, SHWARTZ and VAN ANTWERPEN,
*Circuit Judges*.

(Filed: December 22, 2015)

Neal A. Sanders, Esq.
Law Offices of Neal Alan Sanders
1924 North Main Street Extension
Route 8 North
Butler, PA 16001
          *Counsel for Appellant*

John J. Myers, Esq.
William S. Myers, Esq.
Eckert Seamans Cherin & Mellott, LLC
600 Grant Street
44th Floor, US Steel Tower
Pittsburgh, PA 15219
          *Counsel for Appellee*
                    _____

OPINION
                    _____

VAN ANTWERPEN, *Circuit Judge*.

Appellant Catherine Willis appeals the final decision of the U.S. District Court for the Western District of Pennsylvania granting University of Pittsburgh Medical Center Children's Hospital of Pittsburgh's ("Children's") Motion for Summary Judgment on her Age Discrimination in Employment Act of 1967 ("ADEA") and Pennsylvania Human Relations Act ("PHRA") claims. For the following reasons, we will affirm the decision of the District Court.

## I.     Factual Background and Procedural History

### A.     *Factual Background*

Viewing the record in a light most favorable to the nonmovant, Willis, the facts in this case are as follows. Willis worked as a Neonatal Nurse Practitioner ("NNP") at Children's from August 16, 1993 until her termination on January 13, 2012. (A-375). From 2001 until 2011, Willis served as co-lead NNP. (A-84, A-87). At all times relevant to the instant action, Margaret Lamouree, the nurse manager for the newborn intensive care unit ("NICU") was Willis's supervisor. (A-85–A-86). Lamouree's supervisors were Cynthia Valenta and Diane Hupp. (A-85–A-86). From August 2011 through January 2012, Children's issued disciplinary warnings to Willis for her conduct in three distinct incidents, the relevant details of which are included below.

The first disciplinary incident took place one morning in mid-August 2011. While on duty, Willis received a call that she was needed in the room of a patient who had recently undergone surgery necessitating an endotracheal tube. (A-105–A-106). In the hallway on her way to assist the patient, Willis passed a nurse who remarked to Willis that the patient's tube must be out. (A-106). In response, Willis stated, "[t]hat fuckin [sic] tube better not be out, I'll fuckin [sic] kill someone." (A-346). The patient's father was in the room at the time, but did not hear Willis's statement. (A-278–A-279). Willis received a final written warning regarding this incident in early September, which stated that she would be removed from her role as a co-lead NNP.[1] (A-344).

---

[1] The co-lead NNP role vacated by Willis was not permanently filled until September 2012, approximately one year after Willis's demotion, when Becky Graves was named to this position. At the time of her promotion, Graves was thirty-four years old. (A-289–A-290).

Later that month, after she received the written notice of the warning and demotion, Willis attended a meeting at which Lamouree and Valenta were present. (A-86–A-87). At the meeting, clinical leadership explained that the co-lead NNP role was changing to include a greater focus on administrative and budgetary duties, rather than patient care. (A-87–A-88). Willis was interested and thought she was qualified for the role, but felt that Lamouree and Valenta coerced her to step down. (A-88).

The second disciplinary incident took place in early January 2012. One evening while Willis was on duty, another nurse indicated she was looking for someone to start an intravenous line on a patient. Frustrated with the nurse, whom Willis believed to be inexperienced, and concerned that there was not enough time to look for someone else, Willis started the line herself. (A-112). Afterwards, Willis approached the NICU clinical leadership to express her concerns about the inexperience of some of the nursing staff. (A-113–A-114). Willis raised her voice loud enough for the NICU supervisor Missy Locke, who was nearby, to hear her. (A-114–A-115). A week later, Lamouree sent Jenelle Taylor in Human Resources an email summarizing her conversation with Willis about the incident. (A-347–A-348). Lamouree's email stated that Willis became defensive when Lamouree told her the clinical leaders were offended by how Willis handled the situation. (A-347–A-348). When Lamouree asked Willis if she thought that she could have communicated her concerns without yelling, Willis said, "[n]ever mind I'm always wrong" and walked out of the room. (A-347–A-348). Willis denies yelling, but otherwise agrees with Lamouree's characterization of the incident. (A-122–A-125).

4

The third disciplinary incident occurred one night the following week when Willis was near the end of her shift. On any shift, all the NICU nurses are split into two teams, blue and green. (A-384). Willis, who was assigned to the green team that night, received a patient who was assigned to the blue team, but did not perform a history and physical or complete admission orders, as required. (A-127–A-129). There is some confusion about who was supposed to take care of these tasks. Willis contends that another nurse, Holly Bernardi, who was assigned to the blue team that night, was responsible. (A-129).

Concerned that this patient's care fell through the cracks, Hupp called both Willis and Bernardi at home after their shifts to discuss the incident. Hupp documented the call with Willis in an internal memo. (A-350). Willis told Hupp that she thought she had placed the admission orders, but, as Bernardi was aware, this was the extent of the responsibility Willis assumed. (A-350). The next day, Willis emailed Hupp about their conversation the previous night regarding the incident, and stated that she put the admission orders in and relayed this information to Bernardi. (A-351). Hupp forwarded the email to Taylor in Human Resources. (A-351). At her deposition, Willis again stated that the patient was Bernardi's and not her responsibility at all, but that she completed the admission orders, which Bernardi knew. (A-127–A-128). Hupp's internal memo, the contents of which Willis does not dispute, indicates that Willis left without completing the patient's admission orders. (A-129, A-350). Willis also told Hupp that it was common practice for nurses to complete admission orders received at the end of their shift, but then pass along the physical and history to those in

5

the oncoming shift. (A-128–29, A-350). When Lamouree asked Willis if this is what she did that night, Willis said that it had been "very busy" and she was unable to recall to whom she had reported about the patient. (A-350).

Two days after this incident, on January 13, 2012, Hupp, Valenta, and Lamouree met with Willis to terminate her employment. (A-156, A-342–A-343). Willis was sixty-one years old at the time of her termination, making her a member of a protected class under the ADEA and the PHRA. (A-76).

### B. Procedural History

Willis filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in April 2012. (A-352–A-355). The EEOC closed Willis's case and issued a right to sue letter in November 2012. (A-38). Willis brought suit against Children's in the Western District of Pennsylvania on January 28, 2013. After Children's filed an Answer to the Complaint, Willis filed an Amended Complaint, to which Children's filed an Answer.[2] (A-24–A-

---

[2] Willis's Amended Complaint includes "Hostile Work Environment" in the subheadings for Count 1 (ADEA) and Count 2 (PHRA), but does not provide any supporting factual allegations for a hostile work environment claim. (A-48–A-55). Willis's brief in opposition to Children's Motion for Summary Judgment is similarly silent on a hostile work environment claim. (A-206–A-207). As a result, the District Court concluded this was a drafting error, and accordingly deemed the claim abandoned. (A-2 n.1). Willis does not raise a hostile work environment claim on appeal, rendering further

26). The District Court, (Flowers Conti, J., C.J.), granted Children's Motion for Summary Judgment on both claims. (A-22). This timely appeal followed. (A-1).

## II.    Discussion[3]

### A.    *Standard of Review*

We exercise plenary review over a district court order granting summary judgment. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 (3d Cir. 1998). Accordingly, we engage in the same analysis as the district court initially applied. *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 246 (3d Cir. 2002). We will affirm the grant of summary judgment if the moving party has shown that the evidentiary material on the record, if reduced to admissible evidence, is insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

On a review of an order granting summary judgment, this Court is required to construe all facts and inferences in favor of the nonmoving party. *Simpson*, 142 F.3d at 643 n.3 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994)). Summary judgment is appropriate when "the movant

---

consideration unnecessary.

[3] The District Court had jurisdiction to hear Willis's federal claim pursuant to 28 U.S.C § 1331. It had jurisdiction over Willis's state law claims pursuant to 28 U.S.C. § 1367(a). We have jurisdiction to review final orders of a district court pursuant to 28 U.S.C. § 1291.

shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one that "affect[s] the outcome of the suit under the governing law" and could lead a reasonable jury to return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact. *Simpson*, 142 F.3d at 643 n.3 (quoting *Fuentes*, 32 F.3d at 762 n.1). Once the moving party has done so, to avoid the entry of summary judgment against them, the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof. *Celotex Corp.,* 477 U.S. at 323. If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party. *Id.* at 322–23.

### B.    Analysis

Willis claims Children's discriminated against her on the basis of age, in violation of the ADEA and the PHRA. Since this Court has determined that the interpretation of the PHRA is identical to that of federal anti-discrimination laws, including the ADEA, we present a single analysis for Willis's claims under both statutes.[4] *Fasold v. Justice*, 409 F.3d 178,

---

[4] There is an exception "where there is something specifically different in its language requiring that [an anti-discrimination statute] be treated differently." *Fasold v. Justice*, 409 F.3d 178, 184 n.8 (3d Cir. 2005) (quoting

184 n.8 (3d Cir. 2005) (quoting *Fogelman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002)); *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998) ("There is no need to differentiate between . . . ADEA and PHRA claims because . . . the same analysis is used for both.").

### 1.     *Standard for Age Discrimination Claims*

The ADEA prohibits employers from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To succeed on an ADEA claim, a plaintiff must establish, by a preponderance of the evidence, that age was the "but-for" cause of the adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009). Age discrimination claims in which the plaintiff relies on circumstantial evidence proceed according to the three-part burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792 (1973); *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (reaffirming the application of a "slightly modified version of [*McDonnell Douglas*] in ADEA cases").

Under this framework, the plaintiff must first establish a *prima facie* case of discrimination. *Keller*, 130 F.3d at 1108 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). Satisfying the *prima facie* elements creates an

---

*Fogelman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002)). The relevant provisions of the ADEA and the PHRA do not provide any indication that this exception applies here. 29 U.S.C. § 623(a)(1); 43 Pa. Cons. Stat. § 955(a).

"inference of unlawful discrimination." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999) (quoting *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir. 1995)). The elements of a *prima facie* case of age discrimination are that: (1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). This Court has indicated the *prima facie* case is not "intended to be rigid, mechanized, or ritualistic." *Pivirotto*, 191 F.3d at 352 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)). Where the plaintiff is not directly replaced, the fourth element is satisfied if the plaintiff can provide facts which "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Id.*

Once the plaintiff has successfully established a *prima facie* case creating an inference of discrimination, the burden shifts to the employer who must "articulate a legitimate nondiscriminatory reason for the adverse employment action." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 412 (3d Cir. 1999) (citing *Keller*, 130 F.3d at 1108). This second step of *McDonnell Douglas* does not require that the employer prove that the articulated legitimate, nondiscriminatory reason was the actual reason for the adverse employment action. Instead, the employer must provide evidence that will allow the factfinder to determine that the decision was made for nondiscriminatory reasons. *Fuentes*, 32 F.3d at 763.

10

If the employer satisfies this second step, the burden shifts back once more to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual. *Burton*, 707 F.3d at 426–27. In *Fuentes v. Perskie*, this Court recognized two ways in which a plaintiff can demonstrate that the employer's legitimate, nondiscriminatory reason was pretextual. 32 F.3d at 762. The first way to show pretext is for the plaintiff to point to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action. *Id.* at 765. In order to raise sufficient disbelief, the evidence must indicate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons. *Id.* Alternatively, the second way a plaintiff can establish pretext is to point to evidence that would allow a factfinder to believe that an invidious discriminatory reason was "more likely than not a motivating or determinative cause" of the employer's action. *Id.* at 764. Specifically, the plaintiff can show pretext this way by presenting evidence "with sufficient probative force" so as to allow the factfinder to "conclude by a preponderance of the evidence that age was a motivating or determinative factor." *Simpson*, 142 F.3d at 644–45 (citing *Keller*, 130 F.3d at 1111). Pointing to evidence demonstrating any of the following satisfies this second way to prove pretext: (1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably. *Simpson*, 142 F.3d at 645 (citing *Fuentes*, 32 F.3d at 765). If this step is satisfied, at trial the plaintiff must

11

convince the factfinder that not only was the employer's proffered reason false, but the real reason was impermissible discrimination. *Fuentes*, 32 F.3d at 763 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515).

### a. Prima Facie *Case*

Since the parties agree that Willis has satisfied the first three elements of a *prima facie* case, the only element at issue is the fourth: whether Willis has presented evidence that raises an inference of age discrimination. (A-10). Willis claims that she has satisfied this element by demonstrating that Children's treated similarly situated, but substantially younger, individuals more favorably. (Appellant Br. 10). The District Court rejected this argument, finding the evidence Willis provided "would not permit an inference of intentional discrimination." [5] (A-13). Accordingly, the District Court

---

[5] In the proceedings below, Willis asserted that there were three ways she satisfied the fourth element of her *prima facie* case. First, Willis claimed that she satisfied this element because Graves, a substantially younger employee, replaced her as co-lead NNP. The District Court rejected this argument since at the time of her termination, Willis was no longer co-lead NNP. (A-11). Second, Willis contended that Children's hiring three NNPs, all of whom were substantially younger than her, satisfied this element. The District Court concluded that there was insufficient evidence in the record to support this contention since Willis had not provided information about these employee's ages, or more importantly, that they assumed Willis's duties. (A-11). Third, Willis advanced the sole argument she raises on appeal, that she satisfied the

found that Willis had not "adduced sufficient evidence to establish a *prima facie* case."[6] (A-13).

On appeal, Willis renews her claim that the evidence she provided raises an inference of discrimination that Children's treated similarly situated, substantially younger employees more favorably. (Appellant Br. 10). To demonstrate more favorable treatment of similarly situated, substantially younger employees, Willis references the three disciplinary incidents, and cites the lack of discipline for substantially younger employees engaging in the same or similar conduct. (Appellant Br. 10–12). However, with respect to the first incident in August 2011, Willis states "[t]here is no . . . indication on the record that any substantially younger employee was ever reported for using profanity, much less disciplined for it." (Appellant Br. 11). With respect to the second incident, which took place in early January 2012, Willis also admits that "[t]here is nothing on the record to indicate that there are any similarly situated employees of any age who were accused, falsely or not, of raising their voices or yelling at Clinical Leaders." (Appellant Br. 11). Willis's reference here to the lack of discipline goes against her argument of more favorable treatment of younger employees, since she admits there is no evidence that anyone,

---

fourth element because Children's treated similarly situated, substantially younger employees more favorably. (A-12).

[6] Because Willis's Amended Complaint did not cite the demotion from co-lead NNP as an adverse employment event, the District Court did not treat it as such and instead found that Willis's termination was an adverse employment action, in satisfaction of the third element of a *prima facie* case, with which Children's agreed. (A-10 n.3).

13

including employees her own age, committed these same infractions and escaped discipline. (Appellant Br. 11). In conceding this, Willis admits that there is no evidence to support her point, but attempts to use this omission in her favor.

The argument that the absence of disciplinary incidents involving younger staff members is evidence of more favorable treatment, defies this Court's precedent and logic. This Court has emphasized that evidence of more favorable treatment cannot be viewed in a vacuum, but rather that the record must be viewed as a whole. *Simpson*, 142 F.3d at 645–46. Viewing the record in its entirety, which includes Willis's documented issues with communication and interpersonal skills, this argument works against Willis. (A-179–A-181, A-337). Instead of showing disparate treatment of Willis as an employee in a protected class, the record, particularly the three disciplinary incidents, supports the concerns of Willis's supervisors that she had difficulty working appropriately with others. The record does not reveal any evidence of similarly situated, substantially younger employees experiencing similar difficulties and not receiving discipline. (Appellant Br. 11).

Assessing the other portions of the record Willis cites in support of her case, she has not pointed to any other evidence that gives rise to the inference that she was terminated due to age discrimination. Willis's argument that Children's discriminated against her on the basis of age is rooted in her own belief that this was the reason for her termination, but she is unable to point to any supporting evidence. Willis concedes that she cannot identify anything Lamouree, Hupp, or Valenta ever said that would suggest an

14

age bias in general, or specifically with respect to Willis. (A-138–A-139). In fact, when questioned at her deposition about the role her age played in her employment at Children's, the only conversation Willis recalled ever having with her supervisors was a statement she made once that she planned to work until age sixty-five. (A-136–A-138). A passing reference to retirement age and Willis's own belief that age discrimination occurred do not comprise sufficient evidence that similarly situated, substantially younger employees were more favorably treated, and therefore do not satisfy the fourth element of a *prima facie* case. *See Pivirotto*, 191 F.3d at 352.

### b.    *Pretext*

The District Court found that even assuming, *arguendo*, that Willis established a *prima facie* case of age discrimination, her claims still ultimately failed because she did not demonstrate pretext. (A-13). At the second step of *McDonnell Douglas*, Children's cited the three disciplinary incidents as legitimate, nondiscriminatory reasons for terminating Willis's employment. (A-13). The District Court found that these reasons satisfied Children's burden, stating "the nature and documentation of these disciplinary incidents, and their acknowledgement by Willis . . . [are] sufficient for a reasonable jury to find that Children's dismissed Willis for reasons other than her age." (A-13). Willis responds that these reasons are riddled with inconsistencies such that a reasonable factfinder could find said reasons were pretext for discrimination. (Appellant Br. 15). As for the first way a plaintiff can prove pretext, the District Court found that Willis failed to present evidence from which a rational factfinder could determine that Children's legitimate, nondiscriminatory reasons with respect to all three incidents

15

"were unworthy of credence." (A-15) (quoting *Fuentes*, 32 F.3d at 765) (discussing the mid-August 2011 incident); (A-17) (discussing the early January 2012 incident); (A-18) (discussing the mid-January 2012 incident). Looking at the second way a plaintiff can prove pretext, the District Court found that Willis did not provide evidence for any of the three possible ways a plaintiff can demonstrate that an impermissible discrimination was more likely than not the determinative cause of the challenged action. (A-18–A-21).

Assessing the record in the light most favorable to Willis, we conclude that she has not shown by a preponderance of the evidence that the legitimate, nondiscriminatory reasons Children's offered were pretext for discrimination. *See Fuentes*, 32 F.3d at 763. As the District Court correctly noted, at the pretext stage it is not a court's role to "rul[e] on the strength of cause for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." (A-15) (alterations in original) (quoting *Keller*, 130 F.3d at 1109) (internal quotation marks omitted). Willis's attempt to cast Children's articulated reasons as pretext are unsuccessful because she does not point to evidence that demonstrates Children's did not in fact rely on its articulated reasons when terminating her employment. *See Fuentes*, 32 F.3d at 765–67.

###### i. *First Method of Proving Pretext*

Assessing the three disciplinary incidents for evidence sufficient for a factfinder to disbelieve the employer's articulated reasons, this Court concludes that Willis is unable

16

to show that her supervisors did not actually rely on her conduct to discipline her and ultimately terminate her employment. For the August 2011 incident, Willis does not dispute that she violated hospital policy by using profanity in close proximity to families and patients. (A-346); (Appellant Br. 5). Instead, she attempts to mitigate her own actions by suggesting that others have committed the same infraction, citing the "fairly commonplace" use of profanity at Children's. (A-118). Willis also asserts that because the patient's father did not hear the profanity, Lamouree's discipline was improper. (Appellant Br. 14). Willis's focus on whether the patient's family heard her outburst is misplaced in the context of this Court's pretext analysis. It does not matter whether the family heard, or even if she was directly in front of the patient's family. Rather, it matters whether Willis's use of profanity was the reason Lamouree disciplined Willis. Since Willis admits to the disciplined conduct, and in light of Children's goal of maintaining the NICU as an environment in which patients and their families feel safe,[7]

---

[7] Willis emphasizes that the patient's family did not hear her use profanity, however the warning she received did not cite the family hearing her as the basis for the discipline. Rather, the warning stated, in relevant part: "On 8/19/11, several staff members witnessed, and upon questioning, you admit to using inappropriate language including the use of the word "fuck" while in close proximity to patients and families." (A-185). Based on the language of the warning, it appears that Children's disciplined Willis because of the very act of using such language in close proximity to patients and families. (Appellee Br. 21–22). Since this uncontroverted act is a sufficient basis for discipline, Willis's arguments about Lamouree's failure to ascertain if the family heard is

Willis has not shown that Lamouree's reason for discipline is so weak as to render it "unworthy of credence." *See Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)) (internal quotation marks omitted); (A-180).

Willis also does not present evidence that renders implausible Children's decision to terminate Willis because of the other two disciplinary incidents. As the District Court noted, the relevant question with respect to Willis's early January confrontation with the NICU leadership is not whether Willis actually yelled, which she denies doing, but whether Lamouree believed Willis treated staff members inappropriately and imposed discipline for that reason. (A-15). In light of Willis's employment record, she has not shown that "[t]he notion that talking loudly could be the basis for discipline is so ludicrous that it cannot possibly be a rational employer's true reason for acting." (A-16) (quoting Appellant Br. 14) (internal quotation marks omitted). It is rational, as the District Court aptly noted, that Lamouree "perceived [this incident] to be another instance of harsh or offensive interpersonal communication by Willis." (A-16). Six months prior to the incident, in Willis's performance review, Lamouree told her that she needed to "improve her communication style, which can be harsh and critical." (A-337). Lamouree stated that before this incident she had received numerous complaints from both nurses and physicians about Willis's "condescending and harsh style." (A-180). Among the reasons Lamouree cited for asking Willis to step down from co-lead NNP were her treatment of staff and subordinate nurses. (A-180–A-181). Based on the record,

---

irrelevant. (Appellant Br. 13).

it was not "ludicrous," as Willis contends, for Lamouree to discipline her for this incident.

With respect to the third disciplinary incident involving the incomplete admission orders, Children's discipline of Willis but not Bernardi does not demonstrate that the discipline was "so plainly wrong that it [could not] have been the employer's real reason." *Keller*, 130 F.3d at 1109. Willis argues that Bernardi was just as culpable, if not more so, despite the two nurse's different actions and responses to Hupp following the incident. Willis communicated to Hupp that she told Bernardi she "had handled the admission" of the baby and "taken care of it." (A-350). Bernardi confirms that Willis did tell her this. (A-359). Bernardi told Hupp she checked in about the patient before the end of her shift and asked Willis if she needed to do anything, to which Willis responded "no, he's fine." (A-359). Based on the communication between Bernardi and Willis, it appears Bernardi had reason to think Willis had assumed responsibility, regardless of whether the patient came in on the blue or green team. Subsequently, Willis's failure to complete the admission orders, which she incorrectly told Hupp she had finished, does not show an inconsistency in Children's discipline. Bernardi, unlike Willis, did not explicitly assume responsibility for a patient and leave her shift without discharging the attendant tasks. (A-359). The evidence to which Willis points fails to create sufficient disbelief so that a factfinder could rationally find that Children's did not rely on these reasons in disciplining Willis.

> ii.     *Second Method of Proving Pretext*

19

As for the second way this Court has recognized a plaintiff can establish pretext, Willis has not presented evidence that supports any of the three categories that would allow a factfinder to believe unlawful discrimination was more likely than not a motivating or determinative cause of her termination. As noted above, Willis was unable to point to any evidence that Children's previously discriminated against her on the basis of age. (A-138). The sole conversation involving age, which was limited to Willis's comment about when she planned to retire, does not support discrimination on Children's part. (A-137–A-138). As the District Court noted, it is common business practice, and not impermissible discrimination, for an employer to inquire about retirement plans in anticipation of staffing needs. (A-19).

Unable to identify any statements by neonatal nurse leadership indicating an age bias, Willis asserts that leadership replacing experienced staff with inexperienced nurses constitutes evidence that Children's has discriminated against others within her protected class. (A-138–A-141). Willis's argument fails in light of her admission that the experienced staff Children's replaced were not fired, but left voluntarily, without conditions suggesting age discrimination. (A-139–A-140). Natural staff turnover and increased hiring related to expansion do not support Willis's argument that Children's discriminated against others in her protected class.

Moreover, the allegedly commonplace nature of profanity at Children's and unconfirmed rumors regarding the non-discipline of another nurse for "abruptness" and "sarcas[m]" do not constitute evidence that similarly situated, substantially younger employees were treated more favorably. (A-118–A-120). The only support Willis provides for the

20

assertion that many employees use profanity and did not receive similar treatment is her statement that "[t]here is . . . no indication on the record that any substantially younger employee was ever reported for using profanity, much less disciplined for it." (Appellant Br. 11). As noted previously, this alleged lack of discipline does not provide sufficient support for Willis's assertion of more favorable treatment. Willis also cited "scuttlebutt" among the nursing staff that another NNP was reported to management for abruptness and sarcasm.[8] (A-119–A-120). Even if this rumor is true, Willis's second-hand account does not provide evidence of more favorable treatment towards a similarly situated, substantially younger employee. The rumored conduct, involving abruptness and sarcasm, is not the same as the use of profanity in close proximity to patients and their families.

---

[8] Willis stated in her deposition that she believes the subject of this rumor to be Becky Graves, who as discussed *supra*, note 1, is substantially younger than Willis. (A-119). The extent of Willis's knowledge on the matter is that Graves was reported to Lamouree by other nurses, but Willis is not sure who reported Graves. Willis stated in her deposition that she believes Children's did not discipline Graves for this reported incident, but Willis admitted her knowledge of this is solely "scuttlebutt" from the NNPs. (A-120).

Willis raised the issue of the non-discipline of Graves in the proceedings below, but does not discuss it in her brief on appeal. Because Willis argues that more favorable treatment of similarly situated, substantially younger employees provides evidence supporting pretext, we address it here, assuming it is not waived, as part of the larger analysis regarding this category of evidence.

Willis does not argue that this conduct was similarly in violation of hospital policy, or as serious in its impact on the hospital environment.

More importantly, Willis is unable to provide specifics to establish that this other employee was in fact not disciplined, and if so, any reason why she was not disciplined. In the pretext context, this type of second-hand, general rumor regarding a single substantially younger employee is insufficient as a matter of law to show pretext. While this Court has acknowledged that evidence demonstrating that a single member of a non-protected group received more favorable treatment can be relevant, "[a] decision adversely affecting an older employee does not become a discriminatory decision merely because one younger employee is treated differently." *Simpson*, 142 F.3d at 645–46. Setting aside the lack of corroboration regarding this incident, the evidence Willis provides on the other employee's non-discipline is not appropriate at the pretext stage "where the factual inquiry into the alleged discriminatory motives of the employer has risen to a new level of specificity." *Id.* at 646 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 516). This rumored, unspecified, and uncorroborated evidence concerning a single employee fails to establish pretext. Accordingly, we will affirm the District Court's grant of summary judgment in favor of Children's on both claims.[9]

---

[9] At deposition, Willis admitted that after Children's terminated her employment, she did not apply for a single job as a NNP, or even in the nursing or health care field, because, as she stated at her deposition, she was "very devastated and very much turned off and soured by what nursing had done to

### III. Conclusion

For the foregoing reasons, we will affirm the final judgment of the District Court dated February 10, 2015.

---

[her] and didn't want to put [her]self in that position." (A-80). Because we hold that Willis did not establish a *prima facie* case of age discrimination, and would not be able to succeed at the pretext stage if she were to meet her *prima facie* burden, we do not reach Children's argument that even if Willis succeeded under the *McDonnell Douglas* framework, she could not recover front or back pay for failure to mitigate damages. (Appellee Br. 24–25).