NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-1646
_____

TONDALAYA DAVIS,
                                        Appellant

v.

ELWYN OF PENNSYLVANIA AND DELAWARE
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-20-cv-5798)
District Judge:  Honorable Karen S. Marston
_____

Argued
March 21, 2023

Before:  JORDAN, GREENAWAY, JR., and McKEE, *Circuit Judges*

(Filed: June 9, 2023)
_____

Mary E. Kramer  [ARGUED]
Murphy Law Group
1628 John F. Kennedy Boulevard
Eight Penn Center, Suite 2000
Philadelphia, PA   19103
        *Counsel for Appellant*

Walter F. Kawaler, III   [ARGUED]
Marshall Dennehey Warner Coleman & Goggin
15000 Midlantic Drive – Suite 200
P.O. Box 5429
Mt. Laurel, NJ   08054
    *Counsel for Appellee*

_____

OPINION[*]

_____

JORDAN, *Circuit Judge.*

While working for Elwyn of Pennsylvania and Delaware, f/k/a Elwyn, Inc. ("Elwyn"), Appellant Tondalaya Davis was sexually and racially harassed by a mentally ill patient.  She filed a lawsuit against Elwyn, making claims under federal and state law and alleging she was the victim of a hostile work environment and of retaliation for reporting the patient's behavior.  Elwyn successfully moved for summary judgment, and Davis now appeals.  Because she has not demonstrated any dispute of material fact showing that she was terminated for complaining about the patient's behavior, we will affirm the Court's order with regard to her retaliation claim.  But, because the record contains disputes of material fact as to whether Davis was subjected to a hostile work environment, we will vacate and remand for further consideration of that claim.

_____

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

2

## I.  BACKGROUND[1]

In October 2018, Davis began working as a Mental Health Program Specialist for Elwyn's New Beginnings Program, a psychiatric lockdown facility that provides care for patients who have been released from involuntary institutionalization at Norristown State Hospital.  As part of the New Beginnings Program, patients are enrolled for a twelve- to twenty-four-month period with the goal of stabilizing their mental health conditions so they can be transitioned back into the community at large.  Patients in the program typically suffer from severe mental, developmental, behavioral, or physical disabilities and require constant care and supervision.

Shortly after starting to work at Elwyn, Davis began to experience racial and sexual harassment from an individual whom the parties refer to as Patient X.[2]  "Patient X has diagnoses of mood disorder, impulse control disorder, and borderline personality disorder."  (App. at 7.)  He would regularly call Davis "a litany of racial slurs" (Opening Br. at 2), referring to her, for example, as an "orangutan" and his "n***** b****,"  (App. at 7.)  He would also harass other members of the staff, often exposing his genitals and telling staff members to "suck his d***."  (App. at 7.)  He would, at times, purposely urinate in his pants or on his bed.  Mr. Jamal Mack, the Director of New Beginnings,

---

[1] We recount the facts, as we must at this stage of the proceedings, in the light most favorable to Davis.  *See infra* note 7.

[2] A pseudonym is used for Health Insurance Portability and Accountability (HIPAA) purposes.

3

testified that Patient X would act in sexually inappropriate ways with Davis "four to five times a week" and would use racial slurs towards her "[d]aily." (App. at 540.)

During one incident, Patient X declared that "he was going to make it a wet T-shirt contest[,]" and he then splashed water from a bottle onto Davis's white shirt and proceeded to place the empty bottle on her breasts. (App. at 149.) This came to be known as the "Water Bottle Incident." Police were called in response to it and to another incident the same day in which Patient X attempted to rip the shirt off another female employee. Elwyn staff had to call the police several times because of Patient X's actions, but he was never jailed or involuntarily recommitted at Norristown State Hospital. Mack testified that the Hospital was unwilling to take Patient X back "because they already knew" about his severe behavioral issues and evidently felt that Elwyn "should be able to deal with him." (App. at 8 n.6.)

Davis approached Mack for guidance on how to handle Patient X's racial and sexual harassment. Mack instructed Davis on Elwyn's policies and procedures, adhering to Patient X's treatment plan, and the importance of "resiliency and ignoring" the behavior. (App. at 139.) Davis and her coworkers were left to "tap people out" when they realized that they were at the limit of their patience. (App. at 139.) "Tapping out" meant asking to be relieved of the responsibility to deal with Patient X, or when seeing a co-worker was at wit's end, offering to step in. Davis testified that the "tap out" method was "what management, basically, told [staff members] to do." (App. at 139.) When Mack was asked if Elwyn had a protocol "to stop [Patient X] or to protect [Elwyn's

4

staff,]" he responded, "No. …. We were not supported by upper management there."

(App. at 534-35.) He further explained:

> [T]here were numerous occasions where I would ask for assistance, because either my staff were getting hurt, staff were – there was a high turnover ratio due to staff getting fired [for placing their hands on Patient X in self-defense.] There were many staff members who were assaulted[.] … Staff were extremely frustrated. And of course, as their leader, I was just as frustrated, and I felt helpless and hopeless that I could not help my staff, and I had to continuously tell them that it's going to be okay, it was going to be okay, and it wasn't okay.

(App. at 537.)

Davis was terminated from her position at Elwyn after an incident that occurred in June 2019. Patient X had urinated on both sides of his mattress in the middle of the night, and Davis decided to place a waterproof cover over the mattress and clean up the mess in the morning so that Patient X could go back to sleep. Patient X at first consented to the plan, and Davis went to notify her on-duty supervisor, Adam Moody. But things became worse as Patient X got increasingly aggressive and told Davis "to hurry up because he was tired[.]" (App. at 171.)

The situation came to head when Davis told Patient X he would have to make his own bed, and he insisted that he was "not going to do it." (App. at 171.) He instead demanded that Davis do it for him. Davis offered him assistance, but Patient X was adamant that he would not touch the bed "at all." (App. at 172.) Based on training she had received at Elwyn, Davis understood that she was not supposed to "do[] things for [patients] … that [staff members were] supposed to teach them and encourage them to do these things on their own." (App. at 173.) She sought assistance from Moody, but,

5

instead of supporting her, Moody told Davis, "you're making this into a thing. Don't make it into a thing; just do it." (App. at 173.) Davis responded that she would assist Patient X but would not "do [it], because we're not supposed to just 'do.'" (App. at 173.)

She then returned to Patient X, who insisted that Davis, and only Davis, would make his bed, or he would get her fired. He hurled grotesque slurs at her, calling her his "n***** maid." (App. at 439.) Davis felt like she was at her limit and she sought to "tap out" with a male coworker named Ralph because Ralph "had a better rapport" with Patient X, who responded to men better because he didn't "really respect women." (App. at 174.) Ralph offered his assistance, but Patient X refused. He was set on humiliating Davis by forcing her to change his urine-soaked bed.

Davis retreated to an enclosed nurse's station where Moody was working and again asked him for help. He again refused, telling her a second time, "[y]ou're making this a thing. You need to make up the bed." (App. at 175.) At that point, Davis claimed she felt uncomfortable returning to Patient X's room because of the Water Bottle Incident, and she expressed her concern that Patient X might get physical with her. She asked Moody, "[w]hy do I have to be the one to help Patient X?" (App. at 175.) While Davis and Moody were conversing at the nurse's station, Patient X stood outside the room, banging on the glass door and screaming curses at Davis.

Moody then told Davis to "make the bed or … go home." (App. at 176.) Davis went home. The next day, Moody began the process of firing her. She was officially terminated in August 2019. Her termination letter stated that Moody had given her a direct order to change the bed and, "[d]espite the instruction being a reasonable work

6

assignment for the program, [Davis] refused to support the resident."[3]  (App. at 494.)

Such a refusal, Moody said, was a violation of Elwyn's policy and warranted Davis's

termination because her "behavior [did] not meet the expected standard of [her] position

and [was] not acceptable."[4]  (App. at 494.)

Davis filed a Charge of Discrimination with the Equal Employment Opportunity

Commission and Pennsylvania Human Relations Commission in January 2020, and she

received a right to sue letter in August 2020.  She then filed a complaint alleging that she

had been subjected to discrimination and a hostile work environment based on her race

and sex, and that Elwyn had unlawfully terminated her employment in retaliation for her

complaining about Patient X's behavior, all in violation of Title VII of the Civil Rights

Act of 1964 and 42 U.S.C. § 1981.  Davis later filed an amended complaint, alleging

those same causes of action and parallel ones under the Pennsylvania Human Relations

Act.[5]

---

[3] In an email calling for Davis's termination, Moody explained that he instructed her to change Patient X's bed in an attempt to de-escalate the situation, stating "that there was no need" for Davis "to debate with Patient X about his abilities and that she should just help him to change his bed and Patient X would go back to bed and [she would] have diffused a potential negative situation by simply offering support."  (App. at 483.)

[4] Elwyn's Policy number 204 states that "[r]efusal to carry out a directive from a manager or supervisor including a verbal refusal, a nonverbal refusal or an unreasonable delay in completing work" is a "major offense[] which will result in either a final written warning or discharge[.]"  (App. at 489.)

[5] Title VII, Section 1981, and the Pennsylvania Human Relations Act are all subject to the same legal standard.  *See Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims."); *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009) ("[T]he substantive elements of a claim under section 1981 are generally identical to the elements of an

Following discovery, Elwyn moved for summary judgment on all claims. It argued that any hostility Davis faced came from Patient X, not from Elwyn's employees, and that Davis was terminated for her refusal to follow her supervisor's orders. Davis countered that there is a genuine dispute of material fact about whether she faced a hostile work environment and whether she was terminated for complaining about Patient X's discriminatory behavior.[6]

The District Court granted Elwyn's motion. It determined that Davis's claims failed because "a reasonable person in the same circumstances [as Davis] would not have been detrimentally affected by Patient X's conduct." (App. at 14.) As to the race-based hostile work environment claim, the Court noted that "Patient X is a severely mentally ill patient who has been receiving care in [a] locked down psychiatric institute for years[,]" and no "objectively reasonable caretaker in this particular setting … would have been detrimentally affected" by his verbal conduct. (App. at 16-17.) Similarly, the Court analyzed the sex-based hostile work environment claim and concluded that "[a]n objectively reasonable person would not have taken [Patient X's sexually harassing] statements or the Water Bottle Incident as anything more than offensive actions and comments from a severely mentally ill patient[.]" (App. at 17.) Such conduct, it stated,

---

employment discrimination claim under Title VII."). For ease of reference, the remainder of the opinion will refer solely to Title VII when discussing Davis's harassment and retaliation claims.

[6] Davis conceded that summary judgment was warranted on her discrimination claim. Given that concession, the District Court did not consider that claim.

8

is "unfortunately … par for the course at psychiatric care facilities like Elwyn." (App. at 18.)

The Court then assumed *arguendo* that Davis had in fact been subject to a hostile work environment but concluded that her claim would still fail because Elwyn could not be held liable for Patient X's actions. It noted that Elwyn took steps to protect its employees from Patient X but that Patient X harassed the entire New Beginnings staff, so it was "impossible to reassign everyone who cared for [him]." (App. at 19-20.) Elwyn had changed its treatment strategy several times to accommodate Patient X, and Elwyn could not remove Patient X from its facility because the nearby psychiatric hospital in Norristown refused to accept him. The Court therefore concluded that, "[b]ecause Elwyn took immediate and appropriate action, it cannot be held liable for Patient X's conduct." (App. at 21.)

The District Court next considered Davis's retaliation claim. It concluded that Davis had made a prima facie showing of retaliation because "she engaged in protected activity by reporting Patient X's purportedly discriminatory and harassing conduct, she was terminated, and her supervisor initiated the termination process the day after she reported Patient X's conduct." (App. at 24.) But the Court concluded that Elwyn provided a legitimate, non-discriminatory reason for firing Davis, namely that she violated company policy when she defied supervisor Moody's order, and that she failed to put forward any evidence demonstrating that the reason for her termination was pretextual. The Court therefore granted summary judgment for Elwyn.

Davis has timely appealed.

9

## II.   DISCUSSION[7]

### A.   Hostile Work Environment

To establish a hostile work environment claim under Title VII, Davis had to demonstrate that:

> 1) [she] suffered intentional discrimination because of [her] sex [or race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) [there was] *respondeat superior* liability.

*Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).  For our purposes, we assume arguendo that the first three prongs were met.  The fourth prong, which asks whether "the discrimination would detrimentally affect a reasonable person in like circumstances," *id.*, requires the court to evaluate the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance[,]" *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 280 (3d Cir. 2001) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

---

[7] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367(a).  We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291.  We review the granting of summary judgment de novo.  *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318 (3d Cir. 2000).  "To warrant summary judgment, the movant must show that, viewing the evidence in the light most favorable to the nonmoving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Daniels v. Sch. Dist. Of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)).

Davis contends that the District Court "erred in granting Elwyn's motion for summary judgment on the basis that a reasonable person in the same circumstances [as Davis] would not have been detrimentally affected by Patient X's conduct."[8] (Opening Br. at 13-14.) She claims that Elwyn is liable for Patient X's behavior because, given Mack's testimony, "a reasonable jury could find that Elwyn not only knew of Patient X's conduct, but that it failed to take reasonable measures to try and stop it." (Opening Br. at 27.) We agree that the record reflects a genuine dispute of material fact, so summary judgment was inappropriate.

The District Court thoroughly considered Patient X's harassing conduct before concluding that an objectively reasonable caretaker in a locked down psychiatric institute would not have been detrimentally affected. But the Court failed to consider the implications of Mack's testimony, and the evidence that Elwyn failed to adequately

---

[8] Davis argues that the Court "improperly based its grant of summary judgment on a ground not raised by either party[,]" (Opening Br. at 9) because it "consider[ed], *sua sponte*, whether Patient X's discrimination would detrimentally affect a reasonable person in like circumstances[,]" (App. at 14.) According to Davis, for the District Court to consider that issue sua sponte, it must satisfy the "conditions identified in" *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215 (3d Cir. 2004). (Opening Br. at 13); *see Gibson*, 355 F.3d at 219 (holding that the court must give notice to the parties before entering summary judgment sua sponte unless: "(1) the point at issue is purely legal; (2) the record was fully developed, and (3) the failure to give notice does not prejudice the party[.]"). The District Court labored under a significant disadvantage. Outside of establishing the legal framework, both parties failed to cite to a single case to provide support for their positions. In light of that, while it is better for courts to give notice to the parties of dispositive issues before addressing their merits, we are not inclined to fault the District Court here for considering an argument only loosely alluded to in Elwyn's briefing. But we need not decide whether the Court made a procedural misstep, as we are vacating and remanding the Court's order with regard to Davis's hostile work environment claim on other grounds.

11

address the toxic work environment that Patient X's behavior created.

Mack testified to "[feeling] helpless and hopeless" that he could not support his staff, and that he "had to continuously tell them that it's going to be okay … and it wasn't okay." (App. at 537.) The unrebutted evidence is that Patient X regularly and severely harassed staff members. Elwyn takes the position that "[w]hen [Davis] expressed to her supervisor, Adam Moody, that Patient X was acting in a defiant manner by refusing to change his bed, Mr. Moody specifically instructed her how to de-escalate the situation, by directing her to remake Patient X's bed and not to insist that Patient X do it alone." (Answering Br. at 27.) A reasonable jury, however, could conclude that Davis did not insist that he do the task himself, that she in fact offered to assist but that Patient X insisted that she do the humiliating task alone. Moreover, despite having full knowledge of the severity of Patient X's conduct, Moody ordered Davis to reenter an intolerably harassing and perhaps even dangerous situation.

A reasonable employee could expect to receive support and protection from her employer rather than instructions to submit to dehumanizing and potentially dangerous behavior. Thus, the record contains enough evidence supporting Davis for a jury to "find the conduct alleged to be so harmful that it altered [Davis's] working conditions[,]" *Abramson*, 260 F.3d at 280, and that Elwyn is liable for the hostile work environment.

**B.      Retaliation**

Title VII's anti-retaliation provision provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has made a charge, testified, assisted, or participated in any manner in an

12

investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

The statute's analysis is governed by the burden shifting framework the Supreme Court articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under that framework:

> If the employee establishes [a] *prima facie* case of retaliation, … "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct and, if it does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."

*Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006) (internal citations omitted).

To establish that an employer's legitimate, non-discriminatory reason for its adverse employment action was pretextual, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

The District Court concluded that Davis established a prima facie case of retaliation but that Elwyn terminated Davis for violating a clearly stated policy against defying supervisors' orders, which was a legitimate reason for her termination. Davis has failed to put forward any evidence demonstrating that the proffered reason was pretextual. She merely contends that "a reasonable jury could find … that [she] was terminated based on her reports of Patient X's harassment and that the use of [the policy] was something Elwyn came up with after it had already decided to terminate Davis." (Opening Br. at 34.) Specifically, she points to evidence that she attempted to "tap out"

13

with her coworker Ralph during the incident leading to her termination but Moody told her to "make the bed or … go home." (App. at 176.) Davis acknowledges that Elwyn's policy requires employees to carry out their supervisors' orders, but the policy "offers no guidelines as to what an employee should do if her manager or supervisor's directive makes her feel unsafe, which was the case for Davis." (Opening Br. at 33.)

The evidence Davis points to as demonstrating pretext, however, amounts to nothing more than a dispute about how to placate Patient X during one of his outrageous outbursts. Davis has not pointed to anything suggesting that Moody's decision to terminate Davis was motivated by retaliation rather than by her refusal to follow his instructions. Although Davis may have held different opinions about how to handle Patient X, the fact that she attempted to "tap out" with her coworker does not suggest that her termination was retaliatory. *See Fuentes*, 32 F.3d at 765 ("To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."). Davis does not dispute that she chose to go home rather than make Patient X's bed, and she has not presented any evidence indicating that she was terminated for any reason other than her refusal to follow Moody's directives. *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 648-49 (3d Cir. 2015) (holding that a reasonable jury could not find pretext when a nurse, who was terminated for violating her employer's policy, failed to demonstrate that she was terminated for any reason other than the violation). Given the record, no reasonable jury could conclude that

14

the policy Elwyn invoked was a pretextual reason to terminate Davis in retaliation for complaining about Patient X's conduct.

## III.    CONCLUSION

For the foregoing reasons, we will affirm the Court's order with regard to Davis's retaliation claim, and we will vacate and remand with regard to her hostile work environment claim.