**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-2938
_____

BRYAN M. SANTINI,
Appellant

v.

COLONEL JOSEPH R. FUENTES; TROOPER J.L.
FUHRMANN; TROOPER R.H. SICKLES; STATE OF
NEW JERSEY; JOHN DOE 1-10 (a fictitious name);
JOHN ROE SUPERVISING OFFICER (a fictitious name);
ABC CORP. 1-10
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 3-11-cv-00639)
District Judge: Honorable Joel A. Pisano
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
June 23, 2015

Before: CHAGARES, KRAUSE and VAN ANTWERPEN,
*Circuit Judges*.

(Filed:  August 4, 2015)

Frank A. Santini, Esq.
Suite 1600
200 Central Avenue
St. Petersburg, FL  33701
        *Counsel for Appellant*

Vincent J. Rizzo, Jr., Esq.
Office of Attorney General of New Jersey
P. O. Box 112
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ  08625
        *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

VAN ANTWERPEN, *Circuit Judge*.

Appellant Bryan M. Santini appeals from two final decisions of the District Court for the District of New Jersey: (1) its September 18, 2013 decision granting summary judgment against him and (2) its May 6, 2014 decision denying his motion seeking reconsideration of the court's September decision. *Santini v. Fuentes*, Civ. Act. No. 11-639-JAP, 2013 WL 5554257, at *6 (D.N.J. Sept. 18, 2013); *Santini v. Fuentes*, Civ. Act. No. 11-639-JAP, 2014 WL 1789545, at *4–5 (D.N.J. May 6, 2014). Appellant challenges only one key ruling of the District Court. Because we believe there are outstanding issues of material fact, we are

compelled to vacate in part the decisions of the District Court and remand this case for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND AND PROCEDURAL

### HISTORY

### *1.   Santini's Version of the Facts*

Because we are reviewing an order granting summary judgment in favor of Defendants-Appellees and a motion to reconsider that order, the following factual summary is based on the facts as averred by Plaintiff-Appellant Bryan Santini ("Santini").[1] This appeal arises from an altercation between Santini and several members of the New Jersey State Police that took place on February 3, 2009. (Deposition of Bryan Santini ("Santini Dep.") 54:14–17). On that day, Santini was working at his family's dairy farm in Harmony Township, Warren County, New Jersey, where he milked cows in the farm's milk house. (Santini Dep. 58:19–59:1). Between 5:00 and 5:30 pm that evening, a fight broke out in the farm's milk house between two women—Tiffany Drake and Crystal Knighton. (*Id.* at 54:21–55:7). Santini witnessed the fight. (*Id.* at 56:12–13). There were approximately ten other witnesses to the fight. (*Id.* at 57:25–58:2). One of those witnesses called the police to report the incident. (*Id.* at 57:22–24).

---

[1] Santini's account is primarily drawn from his sworn deposition, response to interrogatories, and his plea colloquy, all of which have been sworn to or submitted under oath.

3

Shortly thereafter, police officers from Greenwich Township, Lopatcong Township, and the state police arrived at the Santini family farm. (*Id.* at 59:17–60:1). Santini estimates that approximately twenty officers were present; three to five of those officers were from the state police. (*Id.* at 60:5–13). By the time the police arrived, the fight between Drake and Knighton had ended. (*Id.* at 60:18–23). Ms. Drake told the police that Santini had recorded the fight on his cell phone. (Deposition of Trooper J. Fuhrmann ("Fuhrmann Dep.") 39:5–12).[2] Santini—standing outside of the milk house—then spoke with an officer from Greenwich Township to describe what he had witnessed. (Santini Dep. 61:17–21).

During that conversation, an officer from the state police, Trooper J.L. Fuhrmann ("Fuhrmann"), called Santini over. (*Id.* at 61:7–24). As Santini began to describe what he had witnessed to Fuhrmann, the Trooper yelled at Santini to take his hands out of his pockets. (*Id.* at 62:1–5). Santini maintains that he complied and explained that his hands were cold because he had been working in water all day milking cows. (*Id.* at 62:7–9). Fuhrmann responded: "I don't care. Keep them where I [can] see them." (*Id.* at 62:9–10). Santini continued his story; however, after Santini's hands "went back in [his] pockets," Fuhrmann again told Santini to keep his hands where the Trooper could see them. (*Id.* at 62:11–18). Santini maintains that he again immediately complied and apologized, saying: "I'm sorry, I only have my cell phone and my wallet." (*Id.* at 62:18–20).

---

[2] Ms. Drake subsequently denied telling the officers that Santini recorded the incident. However, numerous other sources corroborate her original story.

4

Santini continued his story. However, while he was speaking, he pulled his hands into the sleeves of his sweatshirt. (*Id.* at 62:25–63:4). Santini maintains that he pulled his hands into his sleeves on instinct alone because his hands were cold. (*Id.* at 63:12–14). At that point, Fuhrmann yelled at Santini about his hands for the fourth time. (*Id.* at 63:4–5; 64:20–21). In response, Santini told Fuhrmann that he was going to return to work because he had already told the other officers his story. (*Id.* at 64:20–24). Santini then began to walk back to the milk house. (*Id.* at 64:23–24). At that point, Fuhrmann said "[c]ome here" and grabbed Santini's right wrist. (*Id.* at 65:1–13). The two men fell to the ground, where Santini landed on his side and then rolled onto his stomach. (*Id.* at 65:14–21). As Santini struggled to return to his feet, one officer—who Santini believes was Fuhrmann—jumped on top of Santini and told him to put his hands behind his back because he was under arrest. (*Id.* at 65:23–66:3).

As that officer spoke, other officers were on top of Santini, punching him and beating him with nightsticks. (*Id.* at 66:3–6). At the time, Santini's hands were pinned beneath his body. (*Id.* at 66:7–10). While Santini was facedown, the officers surrounding him instructed Santini to stop resisting. (*Id.* at 67:21–24). Santini understood that their instruction meant for him to remove his hands from beneath his stomach. (*Id.* at 67:25–68:9). In his deposition, Santini states that he was unable to remove his arms because of the weight of the officers on top of him. (*Id.*). However, in Santini's plea colloquy, he admitted that he resisted arrest. (Santini Plea Colloquy[3] 8:22–9:8).

_____

[3] Santini's Plea Colloquy begins at page 79 of the

An officer then sprayed Santini with pepper spray. (Santini Dep. 67:10–12; 68:12–22).[4] Santini states that he was sprayed for thirty seconds to one minute and that two bottles of spray were used. (*Id.* at 68:15–22). After the pepper spray was used, the officers were no longer on top of Santini, he was able to free his arms, and he was subsequently handcuffed. (*Id.* at 68:20–22). After handcuffing Santini, the officers ceased punching, kicking, hitting with batons, and pepper spraying him. (*Id.* at 69:10–16). Santini was then taken to Warren County Jail. (*Id.* at 78:22–23). There, Santini was treated with Tylenol and eye drops. (*Id.* at 79:5–6). He maintains that he had "marks everywhere" after the incident. (*Id.* at 79:2). However, his medical records from the incident reveal no permanent or lasting injuries. (*See generally* App. 125–45).

## 2. *The Troopers' Version of the Facts*

The Troopers' story differs from Santini's in three ways.[5] First, they maintain that Santini was not cooperative

---

Appendix.

[4] Santini cannot identify exactly which officers punched him, hit him with batons, or pepper sprayed him. (Santini Dep. 66–67).

[5] The Troopers' account is primarily drawn from the depositions of Troopers Fuhrmann and Sickles, both of which have been sworn to or submitted under oath, and also from the Supplemental Investigations Report prepared by each Trooper.

with Fuhrmann during the exchange between the two men. (Fuhrmann Dep. 39:14–40:6). They maintain that Santini refused to look at Fuhrmann while Fuhrmann questioned him. (*Id.*). They also claim that Santini never mentioned that his hands were cold from milking cows. (*Id.* at 46:6–10). Second, the Defendants maintain that the physical altercation between Santini and Fuhrmann began when Santini resisted Fuhrmann's attempt to remove Santini's hands from his pockets. (App. 197). Notably, they assert that during the "grasping match" between the two men, Santini struck Fuhrmann with an open palm on the right shoulder. (*Id.*).[6] Third and finally, the Defendants allege that as Santini resisted Fuhrmann's attempts to control his hands, Santini tackled Fuhrmann and grabbed his right leg, bringing the two men to the ground. (*Id.*; Fuhrmann Dep. 51).

### 3. State Court Proceedings Against Santini

As a result of his arrest, Santini was brought before a Grand Jury in Warren County, New Jersey on May 13, 2009. (App. 124). The Grand Jury returned a True Bill against Santini, and he was indicted for aggravated assault under N.J.S.A. § 2C:12-1b(5)(a). (*Id.*). In August of 2009—two days before a scheduled pretrial conference—the State brought two additional charges against Santini: obstruction of justice and resisting arrest. (Santini Plea Colloquy 3). On August 12, 2009, Santini pleaded guilty to the resisting arrest charge only; the aggravated assault and obstruction of justice charges were dismissed as part of his plea agreement. (*Id.* at 3–4). During his plea colloquy, Santini admitted that while he

---

[6] Fuhrmann does not make any reference to this open palm contact in his deposition.

7

was on the ground with various officers on top of him, he resisted their efforts to pull his arms out from beneath him. (*Id.* at 8:22–9:8).

### 4. *Federal Proceedings*

On February 3, 2011, Santini filed a six-count Complaint in federal district court for the District of New Jersey alleging that his rights under the federal Constitution, the New Jersey state constitution, and New Jersey state law were violated by members of the Greenwich Township, Lopatcong Township, and New Jersey State police forces. Specifically, the Complaint alleged (1) violations of Santini's Fourth, Fifth, and Fourteenth Amendment rights, (2) a violation of N.J.S.A. § 10:6-2, (3) violations of the New Jersey state constitution, (4) false imprisonment, false arrest, and malicious prosecution, (5) civil conspiracy, and (6) a violation of the New Jersey Tort Claims Act (N.J.S.A. § 59:1-1 *et seq.*). On September 12, 2011, the District Court dismissed some of the named defendants[7]—leaving Troopers Fuhrmann and Sickles (together, "the Trooper Defendants"), Colonel Joseph R. Fuentes, and the State of New Jersey as the only remaining defendants.

On September 18, 2013, the District Court issued a final order granting summary judgment in favor of the Trooper Defendants and the State of New Jersey and

---

[7] The following defendants were dismissed with prejudice: Defendants Greenwich Township, Sergeant David Voll, Patrolman Dennis Cahill, Chief Richard Guzzo, Lopatcong Township, Detective Michael Patricia, and Chief Scott Marinelli.

dismissing the case. *Santini v. Fuentes*, Civ. Act. No. 11-639-JAP, 2013 WL 5554257, at *6 (D.N.J. Sept. 18, 2013). The District Court dismissed Santini's federal claims[8] finding that (1) the claims were barred by the Eleventh Amendment; (2) no individual defendant was a "person" under §§ 1983, 1985; (3) defendants could defeat Santini's claims for malicious prosecution, false arrest, and false imprisonment; (4) § 1983 precludes recovery solely on the basis of *respondeat superior*; and (5) the Trooper Defendants were entitled to qualified immunity. *Id.* at *4–5 & n.3. The District Court then declined to exercise supplemental jurisdiction over Santini's remaining state law claims (Counts II, III, and VI). *Id.* at *5.

Santini filed a motion asking the District Court to reconsider granting summary judgment in favor of the Trooper Defendants in their *individual* capacities as to Counts I–III of the Complaint.[9] *Santini v. Fuentes*, Civ. Act. No. 11-639-JAP, 2014 WL 1789545, at *1 (D.N.J. May 6, 2014). Santini argued that questions of material fact existed as to whether excessive force was used against Santini. *Id.* at *2. The District Court denied that motion in an Order dated May

---

[8] The District Court characterized three counts as federal: Count I (alleging violations of civil rights under 42 U.S.C. § 1983 and the Fourth, Fifth, and Fourteenth Amendments), Count IV (alleging false imprisonment, false arrest, and malicious prosecution), and Count V (alleging civil conspiracy).

[9] Santini did not mention the State of New Jersey in his motion for reconsideration. *Santini v. Fuentes*, Civ. Act. No. 11-639-JAP, 2014 WL 1789545, at *1 n.1 (D.N.J. May 6, 2014).

6, 2014. *Id.* at \*4–5. This timely appeal followed. On appeal, Santini's arguments mirror those found in his motion for reconsideration—namely that summary judgment against the Trooper Defendants in their individual capacities was inappropriate because there are genuine issues of material fact related to Santini's claim that excessive force was used against him by the Trooper Defendants.

## II.    DISCUSSION[10]

### 1.    *Standard of Review*

This Court exercises plenary review over a district court order granting summary judgment. *Bushman v. Halm*, 798 F.2d 651, 656 (3d Cir. 1986). Therefore, our review is identical to the review performed by the district court. *Id.* Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Id.*

---

[10] The District Court had jurisdiction to hear Santini's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). It had jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367. We have jurisdiction to review final orders of the district court pursuant to 28 U.S.C. § 1291.

The moving party bears the burden of identifying specific portions of the record that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). When determining a motion for summary judgment, we must construe all evidence in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). We are also mindful that "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

We review the denial of a motion for reconsideration for abuse of discretion. *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 673 (3d Cir. 1999).

### 2. *Background: Qualified Immunity*

Santini argues on appeal that the District Court erred in finding that the Trooper Defendants were entitled to qualified immunity with respect to his federal claims. Santini's federal claims primarily arise under 42 U.S.C. § 1983, which provides a cause of action to any individual who has been deprived of his rights under the Constitution or other federal laws by a person acting "under color of law." *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007). "Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they

11

are protected by qualified immunity." *Id.* The doctrine of qualified immunity shields government officials who perform discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of qualified immunity is to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Id.*

This Court performs a two-step inquiry to determine whether a particular government official is entitled to summary judgment based on qualified immunity. First, we ask whether the facts—taken in the light most favorable to the nonmoving party—show that a government official violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, we ask whether that right was clearly established at the time of the official's actions. *Id.* This two-step process has more particularized requirements in an excessive force case such as this one.

In an excessive force case, we determine whether a constitutional violation has occurred using the Fourth Amendment's objective reasonableness test. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Curley*, 499 F.3d at 206–07. To determine objective reasonableness, we must balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 390 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)) (internal quotation marks omitted).

While this inquiry is highly individualized and fact specific, the Supreme Court has provided three factors to guide us through it: (1) the severity of the crime at issue, (2) whether the suspect poses an imminent threat to the safety of the police or others in the vicinity, and (3) whether the suspect attempts to resist arrest or flee the scene. *Graham*, 390 U.S. at 396; *see also Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997) (providing additional factors including "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time"). We evaluate objective reasonableness from the perspective of the officer at the time of the incident and not with the benefit of hindsight. *Maryland v. Garrison*, 480 U.S. 79, 85 (1987). In sum, we employ a "totality of the circumstances" approach for evaluating objective reasonableness. *Curley*, 499 F.3d at 207.

During the second step of the *Saucier* inquiry, we inquire whether—even though an officer violated an individual's constitutional right—immunity should still protect that officer from liability. *Curley*, 499 F.3d at 207. To answer that question, we must determine whether the right violated by the officer was clearly established at the time of the violation. *Id.* (citing *Saucier*, 533 U.S. at 202). To make that determination, we engage in another reasonableness inquiry: "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. Like the reasonableness inquiry conducted in step one, this inquiry is objective and fact specific. Despite these similarities, the step two inquiry is

13

distinct from the inquiry conducted in step one. *Id.* at 205. *Saucier* highlighted this distinction by noting that the purpose of the step two inquiry is to acknowledge the reality that "reasonable mistakes can be made as to the legal constraints on particular police conduct." *Curley*, 499 F.3d at 207 (quoting *Saucier*, 533 U.S. at 205) (internal quotation mark omitted). Put another way,

> [T]he first step of the analysis addresses whether the force used by the officer was excessive, and therefore violative of the plaintiff's constitutional rights, or whether it was reasonable in light of the facts and circumstances available to the officer at the time. This is not a question of immunity at all, but is instead the underlying question of whether there is even a wrong to be addressed in an analysis of immunity. The second step is the immunity analysis and addresses whether, if there was a wrong, such as the use of excessive force, the officer made a reasonable mistake about the legal constraints on his actions and should . . . be protected against suit[.]

*Curley*, 499 F.3d at 207.

Saucier mandated that its two-step inquiry be performed in sequential order, *Saucier*, 533 U.S. at 201, which created "perplexing logical and practical" issues for the lower courts, *Curley*, 499 F.3d at 208. The Supreme Court remedied those issues in *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). After *Pearson*, district and appellate courts have discretion to perform the *Saucier* inquiry in the order we deem most appropriate for the particular case before us. *Id.*

14

### 3. The District Court's Decision

Here, the District Court made only a fleeting reference to qualified immunity in its September 18, 2013 Opinion:

> It should be noted that, in finding Plaintiff's constitutional rights were not violated, Troopers Fuhrmann and Sickles are entitled to qualified immunity on Plaintiff's § 1983 claims. However, the Court need not analyze this issue[, qualified immunity,] because for the reasons set forth above, Defendants' [sic] are already entitled to judgment on Plaintiff's federal constitutional claims.

*Santini*, 2013 WL 5554257, at *5 n.3 (citation omitted).[11] It addressed qualified immunity in more detail in its May 6, 2014 Opinion denying Santini's motion for reconsideration. In that opinion, the District Court found that Santini did not satisfy the first step of the *Saucier* inquiry: establishing that a constitutional violation occurred. *Santini*, 2014 WL 1789545, at *3–4. Based on that finding, the court did not proceed to

---

[11] This footnote demonstrates the District Court's initial misunderstanding as to the scope of two of its findings: (1) that § 1983 cannot override the Eleventh Amendment's prohibition of suits against government officials in their official capacity and (2) that government officials acting in their official capacity are not "persons" under § 1983. Both of these findings extend only to government officials acting in their *official*—as opposed to individual—capacity. Santini's Complaint explicitly stated that he was bringing charges against the Trooper Defendants in their official and individual capacities. (Complaint ¶¶ 2–4).

15

the second *Saucier* step. *Id.* The District Court relied on two facts to find that Santini's constitutional rights were not violated: "Here, Plaintiff does not dispute that he refused to take his hands out of his pockets despite Trooper Fuhrmann's instructions to do so, and further admits the fact that he attempted to resist arrest." *Id.* at *4.

For the reasons detailed below, we find that while the District Court stated the appropriate test to determine qualified immunity, it failed to properly construe all facts and inferences in Santini's favor. As our analysis below shows, when all facts and inferences are taken in Santini's favor, a reasonable factfinder could find that Santini's constitutional rights were violated. Therefore, the District Court's grant of summary judgment on that issue was inappropriate. We accordingly vacate in part the court's decisions dated September 18, 2013 and May 6, 2014 and remand them for further proceedings consistent with this opinion.

### 4. *Analysis*

At the outset, we emphasize that in reviewing an order granting summary judgment, we *must* construe all facts and inferences in favor of the nonmoving party—in this case: Santini. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

We have discretion to perform the two steps of the *Saucier* qualified immunity inquiry in the order we deem appropriate. *Pearson*, 555 U.S. at 236. We proceed first with the constitutional violation inquiry to remain consistent with the District Court's May 6, 2014 Opinion. We employ the *Graham* totality of the circumstances test and begin with an

16

analysis of (1) the severity of Santini's crime, (2) whether Santini posed an imminent threat to the safety of the police or others in the vicinity, and (3) whether Santini attempted to resist arrest or flee the scene. *Graham*, 390 U.S. at 396.

Construing all facts in Santini's favor, a reasonable jury could find that the severity of crime factor weighs in his favor. The police arrived to the Santini family farm in order to investigate a fight between two women—not any sort of criminal activity on the part of Santini. Accordingly, Santini was initially only a witness to, not a suspect of, a crime. Nevertheless, after the altercation with Fuhrmann, Santini was charged with aggravated assault under N.J.S.A. § 2C:12-1b(5)(a), a fourth degree crime in New Jersey. (App. 222).[12] However, under Santini's version of the facts, he did not commit that offense. (*See* Santini Dep. 65–66).[13] Further, the

---

[12] "Crimes are classified by degree. Degrees range from first to fourth degree offenses. A **First degree** crime carries the potential penalty of 10-20 years in prison. A **Second degree** crime carries a potential penalty of 5-10 years. Defendants who are convicted of first and second degree crimes face a **presumptive** term of incarceration. It is assumed that they will be sentenced to serve time in prison. A **Third degree** crime may result in 3-5 years if convicted, while **Fourth degree** crimes carry a potential penalty of up to 18 months in jail. There is a presumption of non-custodial sentences on 3rd and 4th degree offenses." *The Criminal Justice Process*, NEW JERSEY COURTS, *available at* http://www.judiciary.state.nj.us/criminal/crproc.htm.

[13] The Eastern District of Michigan confronted a case with some similarities to Santini's in *Cervantes v. Torbett*,

17

aggravated assault charge was subsequently dropped. (Santini Plea Colloquy 4). Ultimately, Santini pleaded guilty to one count of resisting arrest, a disorderly persons offense in New Jersey.[14]

Under Santini's averment of the facts, a reasonable jury could also find that the imminent threat factor weighs in his favor. We again emphasize that at the beginning of Santini's encounter with the police, he was not suspected of criminal activity. Santini does admit that he did not obey Fuhrmann's commands to keep his hands in plain sight. However, under our totality of the circumstances approach, this fact does not compel us to find against Santini. First, Santini maintains that he initially complied with each of Fuhrmann's requests to show his hands. Moreover, he contends that he explained to Fuhrmann that he was only covering his hands because they were cold. His action of

---

No. 08-14390, 2010 WL 743045 (E.D. Mich. Mar. 1, 2010) (unpublished). There, the district court found that the severity of crime factor weighed in favor of the plaintiff—who was also the nonmoving party on a motion for summary judgment—where she was charged with assaulting an officer, but, under her version of the facts, an assault never occurred. *Cervantes*, 2010 WL 743045, at *7.

[14] Disorderly persons offenses "carry less restrictive punishments upon conviction." *The Criminal Justice Process*, NEW JERSEY COURTS, *available at* http://www.judiciary.state.nj.us/criminal/crproc.htm. In New Jersey, a resisting arrest conviction carries with it a maximum of six months in prison and a $1,000 fine. (Santini Plea Colloquy 6).

18

balling his hands into his sleeves is consistent with that explanation. Finally, the police, including Fuhrmann, initially wanted to speak to Santini because they believed he had recorded the incident between Drake and Knighton on his cell phone. During their conversation, Santini informed Fuhrmann that he had his cell phone in his pocket. Therefore, to the extent that Fuhrmann observed a hard object in Santini's pocket, a jury could find that an objectively reasonable officer in his position would have thought that object was Santini's phone. This inference is further supported by the absence of other facts suggesting that Santini was armed or otherwise posed a threat to officer safety.

The final *Graham* factor—whether the suspect attempts to resist arrest or flee the scene—is somewhat inconclusive in this case. While Santini did admit to resisting arrest in his plea colloquy (Santini Plea Colloquy 8:22–9:8), his resistance was not violent.[15]

Under *Graham*, we ultimately weigh the invasion on Santini's individual rights against the interests of the Trooper Defendants. Under Santini's version of the facts, this balance

---

[15] A reasonable jury could also find under Santini's version of the facts that several of the *Sharrar v. Felsing* factors weigh in Santini's favor. For example, there was a limited possibility that Santini was violent, as he was only a witness to—rather than a suspect of—a crime. Further, by the time Fuhrmann was speaking with Santini, the fight between Drake and Knighton had ceased and the situation was calm. Trooper Fuhrmann had no other individuals to contend with other than witnesses, and there were multiple other officers at the scene.

19

tips in his favor. Again, taking all facts and inferences in his favor, the infringement on Santini's rights was great: he was grabbed, tackled, punched, kicked, and pepper sprayed. Conversely, there was only limited justification for the government's actions as Santini was a witness to a crime, he did not threaten violence against the officer, the scene that the officers were confronted with was peaceful at the time of the Santini interaction, and there were many officers at the scene.

Therefore, material factual disputes exist as to whether Santini's constitutional rights were violated. The existence of those disputes compels us to find that the District Court's grant of summary judgment was inappropriate, as was its denial of Santini's motion to reconsider that decision. *See Curley*, 298 F.3d at 278 ("Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis."). We also find that those factual issues must be resolved by a jury, not a judge. *See id.* ("[T]he existence of disputed, historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue."). We accordingly vacate in part the decisions of the District Court and remand this case for further proceedings consistent with this Opinion.

### 5. *Santini's State Law Claims*

The District Court declined to exercise supplemental jurisdiction over Santini's state law claims based on its dismissal of his federal claims. We instruct the court to reconsider that decision on remand based upon its resolution of Santini's federal claims.

20

### III.    CONCLUSION

For the foregoing reasons, we will vacate in part the decisions of the District Court dated September 18, 2013 and May 6, 2014 and remand them for further proceedings consistent with this Opinion.