NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 15-2669

_____

WILLIAM C. PEAKE

Appellant

v.

PENNSYLVANIA STATE POLICE,
a department of the Commonwealth of Pennsylvania

_____

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 2-12-cv-01761)
District Judge: Honorable Cathy Bissoon

_____

Submitted Under Third Circuit LAR 34.1(a)
February 29, 2016

Before: AMBRO, JORDAN, and SCIRICA, Circuit Judges

(Opinion filed:  March 15, 2016)

_____

OPINION[*]

_____

AMBRO, Circuit Judge

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

William C. Peake appeals from an entry of summary judgment in favor of his former employer, the Pennsylvania State Police, on his claim of race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* For the reasons noted below, we affirm.

## I.

William C. Peake is an African American who enlisted in the Pennsylvania State Police in May 2009. Prospective troopers are required to complete an 18-month probationary period, composed of 6 months of formal education at the State Police Training Academy and a 12-month field training program at a patrol station. The latter includes periodic written evaluations of the trooper's performance and a General Investigation Report (the "Investigation Report"). The Investigation Report is conducted approximately 7 or 8 months into the field training program and is used to determine whether a probationary officer should be retained. A Probationary Trooper Review Panel reviews the Investigation Report, and if the trooper is found to be deficient, a separate review by the Probationary Trooper Administrative Review Panel (the "Administrative Review Panel" or "Panel") occurs.[1] The latter Panel makes its recommendation to the Commissioner of the State Police, who makes the final decision regarding trooper retention.

In November 2009 Peake successfully completed his formal education at the Police Academy. He was 1 of 4 African Americans of the 88 graduates in his cadet class.

_____

[1] The Probationary Trooper Review Panel consists of captains and lieutenants. The Administrative Review Panel is composed of majors and the head of the Human Resources Department.

After graduation the State Police assigned Peake, along with 7 white probationary officers from his cadet class, to the Uniontown, Pennsylvania barracks of Troop B for his field training. The other 3 African Americans from Peake's cadet class were assigned to barracks in Eastern Pennsylvania.

On November 3, 2010, the scheduled end of his probationary period, Peake was terminated from the State Police. His letter of termination stated "that as a result of [his] lack of solid job knowledge and basic police skills, along with officer/public safety concerns, [he] [did] not meet the standards set forth of a Pennsylvania State Police Trooper." App. 27. The Commissioner relied on the recommendation of the Administrative Review Panel in making the decision to terminate Peake. The Panel found several factors as grounds for dismissal, including mishandled accident investigations, reports with errors and incorrect information, written and oral communication problems, and competency concerns voiced by supervisors, colleagues, and outside agency personnel. *Id.* at 72–76. The Panel's recommendations were based on the Investigation Report conducted by Corporal Michael Irwin, Peake's immediate supervisor. It noted several deficiencies and misconduct. First, Corporal Irwin found that Peake had treated two "reportable" traffic accidents, where an occupant is seriously injured or the vehicle must be towed, as "non-reportable" accidents. Second, despite multiple remedial courses in police report writing, Peake continued to turn in reports that had spelling and grammatical errors and inaccurate factual representations. Third, he submitted late reports and missed magistrates' hearings, two of which resulted in charges being dropped. Fourth, Peake had oral communication problems when excited.

The only other individual from Peake's cadet class to be terminated at the conclusion of the probationary period was Trooper #9, a white male assigned to Troop M in Bethlehem, Pennsylvania. Prior to Trooper #9's dismissal, however, he was given a written action plan and extensions that totaled in excess of 7 months. Additionally, several other probationary officers in Troop B were given extensions to bring up their performance standards. None of the other probationary officers in Troop B were terminated at the conclusion of the probationary period. Peake argues that he was given less favorable treatment than Trooper #9 and the other probationary troopers in Troop B because he is African American.

The District Court granted summary judgment in favor of the State Police and dismissed the action.

## II.

The District Court had original jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

"We exercise plenary review over a district court's grant of summary judgment." *Chavarriaga v. New Jersey Dept. of Corr.*, 806 F.3d 210, 218 (3d Cir. 2015) (citation omitted). "To prevail on a motion for summary judgment, the moving party must demonstrate 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shelton v. Bledsoe*, 775 F.3d 554, 559 (3d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). A material fact is one that would affect "the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

4

(1986)).  When determining whether there is an issue of material fact, we must review the record and draw all inferences in favor of the non-moving party.  *Shelton*, 775 F.3d at 559.

**III.**

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Claims of discrimination in violation of Title VII are analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  First, the plaintiff must establish a *prima facie* case of discrimination.  *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).  To do so, a plaintiff must demonstrate that he (1) was a member of a protected class, (2) was qualified for the position, (3) suffered an adverse employment action, and (4) the circumstances of the adverse employment action imply discrimination.  *Id.* at 410–11.  "Once a plaintiff under Title VII establishes a *prima facie* case, the employer must come forward with a legitimate, non-discriminatory reason for the adverse employment decision."  *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 319 (3d Cir. 2000) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–56 (1981)).  "If the employer is able to proffer a legitimate, nondiscriminatory reason for its actions, the plaintiff must demonstrate that the proffered reason was merely a pretext for unlawful discrimination."  *Id.* (citing *Reeves v. Sanderson Plumbing Prod. Inc.*, 530 U.S. 2097 (2000)).

The District Court found that Peake had not made out his *prima facie* case for race discrimination because he had not established his termination gave rise to an inference of discrimination. *Peake v. Pennsylvania State Police*, No. 12-1761, 2015 WL 3646446, at *3–6 (W.D. Pa. June 10, 2015). Specifically, he had not introduced any similarly situated comparators and could not show a causal link between his membership in a protected class and the adverse employment action. *Id.* Further, the Court concluded that, even if Peake had established a *prima facie* case, summary judgment would nonetheless be appropriate because he was unable to rebut, by a preponderance of the evidence, that the State Police's legitimate, nondiscriminatory reasons for termination were not a pretext for discrimination. *Id.* at *6–8.

We begin by determining whether Peake introduced any valid comparator to establish his termination as inferring discrimination. An unlawful inference of discrimination can be shown by identifying a similarly situated individual, outside of the protected class, who engaged in the same conduct and was treated more favorably. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013). "In order to determine who might qualify as a similarly situated employee we must look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace. This determination requires a court to undertake a fact-intensive inquiry on a case-by-case basis rather than in a mechanistic and inflexible manner." *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 305 (3d Cir. 2004).

Peake argues that at least 3 or 4 probationary troopers in Troop B, all of whom were white, were similarly situated comparators that were treated more favorably than he

6

was.  Specifically, he claims that these individuals had a combination of at-fault automobile accidents, inferior productivity to his own, and instances involving bodily harm to the public.  As noted above, Peake's dismissal was due to mishandled accident investigations, deficiencies in report writing, written and oral communication difficulties, and competency concerns voiced by those who observed him.  His dismissal was not attributable to any of the areas of misconduct by the other 3 or 4 probationary officers in Troop B.  Further, Peake cannot offset his deficiencies by noting areas in which he outperformed some of his colleagues in Troop B.

Peake also attempts to compare himself to Trooper #9, a white individual from Troop M in Bethlehem, Pennsylvania.  He asserts Trooper #9 had deficient driving skills, difficulties becoming familiar with the geographic area of his patrol region, difficulties with report writing, trouble in conducting magistrate's hearings, and had at one time fallen asleep while driving.  Although Peake and Trooper #9 each were deficient in report writing, their performance problems were dissimilar.  The most distinguishing feature between Peake and Trooper #9, however, is that their evaluative processes were conducted by different people because they were assigned to different barracks.  The Investigation Report Corporal Irwin produced was a result of previously written evaluations and interviews with supervisors, coaches, district justices, and other people with whom Peake worked.  It was based on a compilation of information coming from people who had a direct relationship with Peake and who were able to observe fully his behavior as a prospective trooper.  We find it significant that 13 out of the 19 individuals interviewed pertaining to Peake's performance recommended that he not be retained.

7

Indeed, not a single individual recommended retention. Trooper #9 only had 1 individual out of 16 recommend that he not be retained. Unlike Peake, Trooper #9 had 5 people recommend an extension of his probationary period. Given that Peake and Trooper #9 were assigned to different barracks, had different supervisors, had different individuals interviewed with regard to their retention, and had different deficiencies, we conclude that Trooper #9 is not similarly situated to Peake.

We also agree with the District Court that even if Peake had established his *prima facie* case of race discrimination, summary judgment was still in order because he did not show that the State Police's legitimate, nondiscriminatory reasons for dismissal were a pretext for racial discrimination. *See id.* at *6–7.

> To survive summary judgment when the employer has articulated a legitimate nondiscriminatory reason for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons[,] or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 (3d Cir. 1998) (quoting *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994)). To discredit the employer's articulated reason for the adverse employment action, the plaintiff must "point to weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the proffered nondiscriminatory reason did not actually motivate the employer's action." *Id.* at 644 (citations omitted)

8

(internal quotations and alteration omitted). To show that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action, "the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [race] was a motivating or determinative factor in the employment decision." *Id.* at 644–45 (quoting *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1111 (3d Cir. 1997)). Examples include showing that the employer has previously discriminated against the plaintiff, that the employer has discriminated against members of the plaintiff's protected class or another protected class, or that similarly situated people not within plaintiff's class were treated more favorably. *Id.* at 645 (citing *Fuentes*, 32 F.3d at 765).

Peake makes several attempts to undermine the State Police's legitimate, nondiscriminatory reasons for termination. He claims termination at the end of the 12-month training period was "rare" (Opening Br. at 5). He also asserts that he was put on desk duty for the final 2 months of his probationary period in violation of the State Police's written protocol. Next, Peake contends that he was not provided a written action plan despite this being common if a trooper was not improving quickly enough. Finally, he notes a contradiction between the termination letter sent to him, which stated he lacked "basic police skills," and a category in his final probationary trooper evaluation with the same name in which he received a rating of "satisfactory" (Opening Br. at 12).

We agree with the District Court that Peake failed to satisfy either prong of the *Fuentes* pretext analysis. As for the first prong, Peake's reasons demonstrating pretext in no way concern the negative evaluations of his performance as a probationary trooper.

9

The only inconsistency he can point to is his termination letter, which stated he lacked basic police skills, and his final trooper evaluation form that rated him as satisfactory in the category of basic police skills. The Court found the terms had different meanings in their respective contexts. In the termination letter, basic police skills was more general and referred to the factors the review panels used in recommending Peake's dismissal. In the probationary evaluation forms, the term was used in a more specific sense. That it was rare for a probationary trooper not to be retained at the end of the 12-month training program, that Peake was not provided a written action plan, and that he was placed on desk duty, in no way suggests that the State Police's legitimate, nondiscriminatory reasons for termination are "unworthy of credence." *Simpson*, 142 F.3d at 644.

With respect to the second prong, Peake does not contend the State Police previously discriminated against him. Further, he does not claim that it discriminated against any other member of his class or any other member of a protected class. He does contend, however, that similarly situated individuals outside his protected class were treated more favorably than he was. Based on the discussion above, we conclude that Peake did not present any valid comparator. Therefore, he does not satisfy the second prong of the *Fuentes* pretext analysis.

*　　*　　*　　*　　*

For the foregoing reasons, we affirm.